# In the United States Court of Federal Claims

No. 18-1708C

(Filed Under Seal:  January 24, 2019)

(Reissued:  January 31, 2019)

| | |
|---|---|
| ************************************* ) | |
| **SPARKSOFT CORPORATION**, ) | Pre-award bid protest; procurement of |
| ) | information technology services; agency's |
| Plaintiff, ) | consideration of new offers following four |
| ) | prior protests; evaluation of compensation |
| v. ) | for professional employees; 48 C.F.R. § |
| ) | 52.222-46; compensation realism; price |
| **UNITED STATES**, ) | reasonableness; 48 C.F.R. § 8.405-2(d); |
| ) | ambiguity in solicitation; agency's answers |
| Defendant, ) | to questions ostensibly limiting its |
| ) | assessment of compensation realism; |
| and ) | declaratory relief |
| ) | |
| **SCOPE INFOTECH, INC.**, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |
| ************************************* | |

David B. Dixon, Pillsbury Winthrop Shaw Pittman, LLP, McLean, VA, for plaintiff. With him on the briefs was Meghan D. Doherty, Pillsbury Winthrop Shaw Pittman, LLP, McLean, VA.

Joshua A. Mandlebaum, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Laurel A. Hockey, Cordatis LLP, Arlington, VA, for defendant-intervenor.  With her on the briefs were David S. Cohen, John J. O'Brien, and Daniel J. Strouse, Cordatis LLP, Arlington, VA.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by brackets enclosing asterisks, i.e., "[***]."

LETTOW, Senior Judge.

Plaintiff Sparksoft Corporation ("Sparksoft") protests the pre-award decision of the Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS" or "the agency" or "the government"), to not conduct a realism analysis on the professional compensation rates embedded within the firm-fixed-price ("FFP") component of bids submitted under the solicitation, Request for Quote No. 170454 ("RFQ"). The RFQ solicits bids for services consisting of information technology operations, maintenance, and ancillary support to maintain CMS' Data Services Hub ("Hub" or "DSH"). For relief, Sparksoft requests this court declare the failure to perform a realism evaluation to be arbitrary, capricious, or contrary to law and issue an injunction requiring CMS to request revised quotes based on clarified solicitation requirements. Compl. at 28, ECF No. 1.

After the administrative record was filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"), Sparksoft filed its motion for judgment on the administrative record on November 30, 2018. *See* Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Mot."), ECF No. 21. The United States responded in opposition on December 14, 2018. *See* Def.'s Cross-Mot. for Judgment on the Admin. Record & Resp. to Pl.'s Mot. for Judgment on the Admin. Record ("Def.'s Cross-Mot."), ECF No. 24. Having been granted permission to intervene, Defendant-Intervenor Scope Infotech, Inc. ("Scope") also filed its response in opposition to Sparksoft's motion on December 14, 2018, along with a motion to dismiss for lack of standing. *See* Def.-Intervenor Scope Infotech, Inc.'s Mot. to Dismiss & Cross-Mot. for Judgment on the Admin Record ("Def.-Intervenor's Cross-Mot."), ECF No. 23. Upon completion of briefing, *see* Pl.'s Reply Br. & Resp. to Def.'s Mot. to Dismiss & Cross-Mot. for Judgment on the Admin. Record ("Pl.'s Reply"), ECF No. 19; Def.'s Reply in Support of its Mot. to Dismiss & Cross-Mot. for Judgement on the Admin. Record ("Def.'s Reply"), ECF No. 33; Def.-Intervenor['s] . . . Reply, ECF No. 34, a hearing was held on January 9, 2019.

## FACTS[2]

### A. *The 2017 CMS DSH Solicitation*

This lengthy, winding tale began on January 19, 2017, when CMS issued RFQ No. 70454, seeking bidders for a data services hub to support the federal and various state-run health insurance markets ("Exchanges"). AR 1-1; AR 2-14.[3] CMS envisioned that the DSH system would "support a first-class customer experience [for the purchase of health insurance on an Exchange market], provide seamless coordination between state-administered Medicaid and [Children's Health Insurance] programs and the Federally Facilitated Marketplace (FFM), and between the FFM and plans, employers, and navigators." AR 2-15. CMS also required the DSH

---

[2]The following recitations constitute findings of fact by the court from the administrative record of the procurement filed pursuant to RCFC 52.1(a). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]The Administrative Record is consecutively paginated, and citations to the record are cited by tab and page as "AR ___- ___."

to "generate robust data in support of program evaluation efforts." AR 2-15. In essence, CMS sought a contractor to "maintain current services, building new services (when required) and maintain current technical solutions and support the operations of the DSH." AR 2-15.

The RFQ was issued as a small business set-aside, under General Services Administration Schedule ("GSA") Schedule 70. AR 11-308 to 09.[4] The RFQ stated the contract would consist of both a firm-fixed-price and a time-and-materials ("T&M") component. *See* AR 6-92; *see also* AR 11-311; AR 12-326, 362. Specifically, the RFQ stated that operations and maintenance work would be ordered on an FFP basis, while any additional enhancement or development work performed on the DSH would be ordered on a T&M basis. *See* AR 12-326, 362. The RFQ required each bidder to submit the cost for one base year, four option years, and a five-year total. AR 11-310. Bids were to be divided into three separate volumes: "business [and] price," "technical," and "business ethics, conflicts of interest, and compliance." AR 11-311 to 14.

CMS stated in the RFQ that it expected to select the winning vendor on a "best overall value" basis. AR 11-315 to 16. To determine which quote would provide the "best overall value," the government would implement a "tradeoff process" between price and non-price factors. AR 11-315.

To evaluate the submitted "technical" volumes, CMS planned to use four non-price factors, listed in descending order of importance: "factor 1: technical understanding and approach," "factor 2: personnel qualifications and management plan," "factor 3: past performance," and "factor 4: evaluation of product/service for Section 508 standards compliance." AR 11-315 to 16 (capitalization removed). Each factor would be evaluated as "either Excellent, Highly Acceptable, Acceptable, or Unacceptable," which would lead to an ultimate rating. AR 11-316. Regarding factor 2, "personnel qualifications and management plan," the RFQ required "[t]he contractor [to] provide the labor categories and hours being proposed and how the contractor intends to manage the staff based on their technical approach." AR 11-312.

As for the other two volumes, the "business [and] price volume" would be evaluated pursuant to FAR § 8.405-2(d),[5] although the RFQ explicitly stated there would be no cost

---

[4] A small business for this purpose is one certified under North American Industry Classification System ("NAICS") code 541512. *E.g.*, AR 11-308.

[5] FAR § 8.405-2 is entitled "Ordering procedures for services requiring a statement of work." FAR § 8.405-2 states regarding evaluation:

> The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors. *The ordering activity is responsible* for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and *for determining that the total price is reasonable.* [The Contracting Officer should] [p]lace the order with the schedule contractor that represents the best value []. After award, ordering activities should provide timely notification to unsuccessful offerors. If an unsuccessful offeror requests

realism analysis as "a cost type of contract is not anticipated." AR 11-316. Rather, information "submitted as required by FAR § 52.222-46 [would] be evaluated as outlined in that provision." AR 11-316.[6] Finally, the "conflict of interest [volume]," would not be scored, but instead used to determine if the bidder met the requisite conflict of interest requirements. AR 11-316 to 17.

### B. *Sparksoft is Awarded the DSH Contract*

On February 17, 2017, CMS received six bids in response to the RFQ. AR 73-1387 to 88. The bids ranged in price from a low of approximately $[***] million to a high of approximately $[***] million. AR 73-1387 to 88.

| Contractor | Quoted Price | Date Quote Received | Revised Final Quote Price | Date Quote Received |
|---|---|---|---|---|
| [***] | [***] | 02/17/2017 | N/A | N/A |
| [***] | [***] | 02/17/2017 | N/A | N/A |
| [***] | [***] | 02/17/2017 | N/A | N/A |
| **Scope Infotech** Subs- QSSI, CNSI | [***] | 02/17/2017 | [***] (including AWS Option) [***] (excluding AWS Option) | 05/08/2017 |
| [***] | [***] | 02/17/2017 | N/A | N/A |
| **Sparksoft** Subs- Cognosante, HighPoint Global, Noblis, Amazon Web Services, MarkLogic, Redhat/Carasoft | [***] | 02/17/2017 | [***] (including AWS Option) [***] (excluding AWS Option) | 05/04/2017 |

AR 73-1387 to 88.

The bids were ranked by technical evaluation, with two bids being deemed technically unacceptable:

---

information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided.

FAR § 8.405-2(d) (emphasis added).

[6]FAR § 52.222-46 is entitled "Evaluation of Compensation for Professional Employees." It states in part, "[*t*]he professional compensation proposed will be considered in terms of its impact upon recruiting and retention, *its realism*, and its consistency with a total plan for compensation." FAR § 52.222-46(a) (emphasis added).

| Evaluation Factor | [***] | [***] | Scope Infotech | [***] | Sparksoft | [***] |
|---|---|---|---|---|---|---|
| Rank | 3 | 6 | 1 | 5 | 2 | 4 |
| Technical Understanding and Approach | A | U | E | U | H | A |
| Personnel Qualifications and Management Plan | A | U | A | U | A | A |
| Past Performance | Evaluated by OAGM[7] | | | | | |
| 508 Product Accessibility Template (PAT) | Y | Y | Y | Y | Y | N |
| Overall Rating | A | UA | HA | UA | HA | A |

AR 73-1390; *see also* AR Tab 66 (Technical Evaluation Worksheet (Consensus) May 10, 2017).

As shown, the bids of [***] and [***] were deemed to be "unacceptable" from a technical standpoint and were excluded from the bidding process. AR 73-1390. The "acceptable" bids of [***] and [***] were priced higher than those of both Scope and Sparksoft, had technical weaknesses, and were similarly culled from the procurement. *See* AR 73-1391 to 92. CMS focused on the two remaining bidders and sought revised quotes from Sparksoft and Scope, the two lowest priced and most highly rated ("highly acceptable") bids, on April 28, 2017, due May 4, 2017. AR 73-1387. CMS' request for revised quotes included a series of questions and clarifications about the vendor's assumptions and quoted software licenses. AR 49-1106 to 08 (questions and clarifications for Sparksoft, Apr. 28, 2017); AR 50-1109 to 10 (questions and clarifications for Scope, Apr. 28, 2017); *see also* AR 108-1812. Notably, in the revised proposals, CMS requested "if at all possible, please provide a quote with no open market [other direct costs]." AR 49-1108, 50-1110.[8]

_____

[7]CMS also received information from prior vendors about the bidders' past performance, and assigned past performance ratings.

| Quoter | Past Performance Rating |
|---|---|
| [***] | Favorable |
| [***] | Favorable |
| [***] | Favorable |
| Scope Infotech | Favorable |
| [***] | Neutral |
| Sparksoft | Neutral |

AR 73-1390 to 91.

CMS held separate phone calls with Scope and Sparksoft on May 1, 2017 to clarify the requirements of the revised proposal. AR 108-1812. In these phone calls, CMS agreed to provide a list of government furnished equipment ("GFE") software licenses, which the vendors would not need to price as other direct cost ("ODC") items. AR 108-1812. After receiving the GFE list from CMS, Scope "revise[d] [its] ODC list to exclude the items covered under GFE" as it presumed the costs would be covered by the government's pre-existing licenses. AR 108-1812. But on May 3, 2017, CMS sent yet another GFE list, this time including the expiration dates for the GFE software licenses. *See* AR 56-1123; AR 108-1812; *see also* AR 51-1111 (License expiration dates). The licenses that expired during the potential term of the contract (including option years) would need to be replaced by the winning bidder. *E.g.*, AR 56-1123. In other words, the bidders would need to price in *some* (but not all) of the ODC costs related to software licenses, as they would need to renew those licenses that expired over the life of the contract.

Following this correction and clarification, *see, e.g.*, AR 57-1126 (E-mail with Sparksoft "double checking understanding of GFE" (May 5, 2017)), Scope submitted a revised bid on May 4, 2017, AR 31-663 & 33-719 to 26 (Scope's Revised Proposal 1), while Sparksoft submitted its revised bid on May 5, 2017. AR 73-1387; *see also* AR 46-1042; AR 47-1090 to 1099 (Sparksoft's Revised Proposal 1). During the Contracting Officer's initial review of these offers, he noticed that Scope's revised proposal excluded *all* ODCs. AR 56-1123 to 24 (E-mail with Scope re: ODC Confirmation (May 5, 2017)) ("I want to confirm that the updated quote you sent includes support of the licenses throughout the life on the contract as needed."). Scope replied that "[i]t is a misunderstanding on my part," AR 56-1123, and it submitted a revised proposal on May 8, 2017 with updated ODC prices, AR 32-69; AR 34-727 to 34. The government ultimately concluded that Sparksoft's lower price provided the best value and awarded Sparksoft the DSH contract. AR 73-1412 to 15 ("To award to Scope would cost CMS roughly $[***] million more than Sparksoft, the benefit of which is really just a shortened learning curve at the beginning of the contract."); *see also* AR 74-1417 (notification of Scope's non-selection, (May 31, 2017)); AR 75-1418 to 19 (Letter to Scope explaining basis for award decision (June 2, 2017)).

## C. *Scope's First GAO Protest*

Scope was not satisfied with this development and protested the decision to the Government Accountability Office ("GAO") on June 8, 2017. AR 81-1482. Scope based its protest on the alleged failure of CMS to conduct a price realism analysis, as required by the RFQ. AR 81-1489 to 91 ("[A]n agency's statement that it intends to evaluate offerors' compensation plans in accordance with FAR § 52.222-46 constitutes an agency's announcement that the agency will conduct a price realism analysis . . . [and] there is no indication that [CMS] conducted any price realism analysis."). In the alternative, Scope argued that even if CMS

---

[8] The issue of software licenses was first raised on April 14, 2017, when the Contracting Officer e-mailed Sparksoft to determine "if it was possible to provide any of the non-[federal sourced supplier] (open market) software licenses on Sparksoft's GSA schedule or on one of its teaming partner's schedules." *See* AR 108-1811. The government made a similar request to Scope on April 17, 2017. AR 108-1811. Scope responded on April 21, 2017 that it would be possible through two of their partners or subcontractors, but would increase the overall price for these items. AR 108-1811. The record does not reflect Sparksoft's response to the request.

conduced a price realism analysis, it was "unreasonable."  AR 81-1492 to 99.  Scope also claimed that CMS erred when assigning a "highly favorable" rating to Sparksoft, that CMS' tradeoff analysis was flawed, and that Sparksoft did not propose a price for a crucial ODC component.  AR 81-1494 to 97.  In response to the protest, CMS "notified [GAO] of its intent to take corrective action by reevaluating the price proposals of [Scope and Sparksoft] and [to] mak[e] a new award decision."  AR 82-1504; *see also* AR 82-1502.  Although Scope disagreed with CMS' proposed corrective action, GAO was satisfied and dismissed the protest as academic on June 29, 2017.  AR 82-1504.  CMS then reconsidered the two bids before re-awarding the contract to Sparksoft on July 28, 2017.  AR 76-1420 (Notification of Scope's Non-Selection Following Corrective Action).

### D.  *Scope's Second GAO Protect*

Scope again disagreed with CMS' decision to award Sparksoft the contract and requested an oral debriefing.  AR 77-1421 (Scope Oral Debriefing Notes (Aug. 1, 2017)).  In the debriefing, CMS noted that both propsals "reflect[ed] a sound management approach and understanding of the contract requirements.  Both support the ability to provide uninterrupted high-quality work."  AR 77-1421.  But as the prices of the two bids did not change (approximately $[***] million to $44.2 million), CMS believed that Sparksoft's bid represented the best value to the government.  AR 77-1421.  After this explanation, Scope again protested the decision to the GAO on August 4, 2017.  AR 83-1505.  In this new protest, Scope alleged that the agency acted in a "misleading, unreasonable, and disparate" way regarding the GFE components, that CMS' price realism analysis was unreasonable, and that the agency's assignment of "highly acceptable" to Sparksoft's bid and the tradeoff analysis were both unreasonable.  AR 83-1511 to 15, 1515 to 19, 1519 to 21.

Unlike the prior protest, however, GAO allowed this second protest to develop with the filing of an agency report, AR 90-1625 (Agency Report (Sept. 25, 2017)), along with briefs by Scope, CMS, and Sparksoft, *see, e.g.*, AR Tabs 83 through 95 (submissions by all parties in the second GAO protest).  After GAO held an alternative dispute resolution conference, *see* AR 108-1813, GAO notified CMS that the Office would likely sustain the protest based on the agency's evaluation of professional compensation.  AR 108-1813.  CMS then notified GAO of its intent to take corrective action and reevaluate the bids of Scope and Sparksoft before issuing a new source selection decision.  AR 96-1665 (GAO Dismissal (Oct. 5, 2017)).  GAO found this solution to be acceptable and dismissed the protest as academic.  AR 96-1665 (Agency re-evaluation "grants the relief requested and renders the protest academic.").  Once again, CMS reevaluated the two bids and awarded the contract to Sparksoft based on its significantly lower price.  AR 73-1384, 1412 to 16 (Award Decision Mem. (Dec. 8, 2017)).

### E.  *Scope's Third GAO Protest*

If time is a flat circle that repeats upon itself ad infinitum, this government procurement followed that paradigm.  Predictably unsatisfied with the result of CMS' third decision to award the contract to Sparksoft, Scope requested an oral debriefing.  AR 78-1422. (Scope Oral Debriefing Notice (Dec. 12, 2017)).  CMS again reiterated the "highly acceptable" rating of both bids and the lower price offered by Sparksoft.  AR 78-1422 ("no change from previous debriefs," AR 77-1421.).  Scope then protested the decision to GAO for a third time on December 13, 2017.  AR 97-1666.  The crux of the third protest by Scope was that CMS' evaluation of

Sparksoft's bid was unreasonable due to Sparksoft's failure to include all required ODCs.  AR 97-1673 to 77.  Scope contended that Sparksoft improperly included items available on the GSA schedule as open market items.  *See* AR 108-1814.  Scope also alleged that Sparksoft's price proposal was inconsistent with its technical approach, that CMS had treated the bidders disparately in evaluating bids, and that CMS had conducted an unreasonable price realism evaluation and tradeoff analysis.  AR 97-1677 to 83.

After the protest was filed, GAO spent the next three months developing the factual record, with each side filing numerous comments on two agency reports produced by CMS.  *See* AR Tabs 98 through 107 (various filings by all parties).  GAO also made specific requests for answers, to which Scope and Sparksoft responded on March 2, 2018.  AR 106-1781 & AR 107-1799 (Scope's and Sparksoft's responses to GAO's questions).  On March 22, 2018, GAO announced its decision, sustaining the protest in part.  AR 108-1809 (GAO Decision (Mar. 22, 2018)).  GAO sustained the protest because "[CMS] unreasonably included the [specific ODC] software licenses as open market items on Sparksoft's task order."  AR 108-1814.  In its decision, GAO found that CMS improperly characterized an ODC software license as an open market item, rather than requiring the license to be priced according to the GSA schedule.  AR 108-1814 to 16.  In short, due to the nature of the solicitation, ODC items (if available) needed to be procured from the GSA schedule.  AR 108-1814 (citing FAR § 8.402(a)).  GAO found that a software license Sparksoft quoted as an open-market item was offered by Carasoft on the GSA schedule.  AR 108-1814 to 15.  As a result, GAO concluded that CMS should have required Sparksoft to quote the software license according to the GSA schedule and *not* as open market item ODC.  CMS had argued the software license was not available on the GSA schedule, but GAO found that "Scope's quotation provided all the necessary information for the agency to confirm that Scope was offering [the specific ODC] on a GSA schedule."  AR 108-1815.  "In sum, we find that the agency unreasonably concluded that Scope did not provide the [specific ODC] licenses on a GSA schedule and that no vendor could provide these items on a GSA schedule."  AR 108-1816.  Consequently, the "agency's inclusion of the open market items on Sparksoft's order" was not "reasonable."  AR 108-1816.  GAO further found Scope "was prejudiced by the agency's inclusion of the open market items because, but for these errors, the protester could have had a substantial chance for award."  AR 108-1816 (internal citation omitted).  As a remedy, GAO recommended CMS "cancel the order to Sparksoft and assess its actual requirements . . . and make a new source selection."  AR 108-1820.  The remaining allegations made by Scope were dismissed as there was no "basis to sustain the protest" on those grounds.  AR 108-1814.

## F.  *Resubmission of Bids in 2018*

CMS then opened the bidding process for the fourth time, inviting revised bids from both Sparksoft and Scope on April 17, 2018.[9]  AR 116-1837; AR 117-1838.  In the revised solicitation, CMS asked both bidders for a revised price quote, but stated they did not need a "revised technical volume" or "a complete updated business volume."  AR 116-1837; AR 117-1838.  Sparksoft submitted its revised quote on April 19, 2018.  AR 125-1854 to 55; AR 126-

---

[9]The delay between GAO's decision and the re-solicitation of the bid was due to CMS' consultation with agency counsel about the language of the request for revised bids.  AR 114-1833.

1857 to 61; AR 127-1862 to 67.  In their new proposal, Sparksoft increased their total price (including all option years and services) from $44,225,676 to $[***].  *Compare, e.g.*, AR 48-1104 (original price), *with* AR 126-1857 (revised FFP) *and* AR 127-1862 (revised T&M). [10] Scope submitted their revised bid on April 20, 2018.  AR 128-1868; AR 129-1872.  Unlike Sparksoft, however, Scope *decreased* their total price (including all option years and services) from $[***] to $[***], a drop of $[***] or 32%.  *Compare* AR 34-727 (original price), *with* AR 129-1872 (revised price).  The Contracting Officer inquired whether Scope's new proposal resulted from the "same level of effort and labor mix" as their February 17, 2017 proposal.  AR 130-1880 (E-mail between Scope and the Contracting Officer (Apr. 23, 2018)).  Scope replied in the affirmative.  AR 130-1880 ("The answer is [y]es." (Apr. 23, 2018)).  As a result, a CMS panel conducted a technical evaluation comparing the number of hours proposed in Scope's new bid with their previous bid.  AR 134-1891 (TEP Review (May 22, 2018)).  The CMS panel found a number of significant decreases in the total number of hours proposed, with some positions being entirely eliminated.  AR 134-1891 to 1900.  The panel concluded that some of these changes were acceptable and others were unacceptable.  AR 134-1891 to 1900.  The panel made various recommendations to Scope respecting the unacceptable changes.  *E.g.*, AR 134-1891 to 1900 (for example, CMS stated for CLIN 4002, "the [position's] hours were reduced from [***] to 0, eliminating this position.  This is not acceptable given Scope's unique technical approach. Based on the technical approach, CMS believes the hours should be increased by [***] hours.").

Due to this evaluation, the Contracting Officer sent Scope a letter on May 22, 2018, asking for alignment of Scope's price quote to its technical volume, noting the findings of the technical panel.  AR 135-1901 (Letter to Scope (May 22, 2018)).  CMS also sent a letter to Sparksoft on May 22, 2018, to "provide Sparksoft the opportunity to submit a new revised quote."  AR 136-1903 (Letter to Sparksoft (May 22, 2018)).  Both companies submitted revised bids.  On May 28, 2018, Sparksoft submitted a revised bid totaling $[***], a decrease of $[***] – or [***]% – from their most recent bid.  AR 139-1910 (E-mail from Sparksoft sending updated price quote (May 28, 2018)); AR 140-1915 (Sparksoft's FFP Quote); AR 141-1920 (Sparksoft's T&M Quote).  On May 29, 2018, Scope submitted its revised bid totaling $[***], an increase of $[***] – or 1.3% – from their most recent bid.  AR 142-1926 (E-mail from Scope with updated proposal and responses to questions (May 29, 2018)); AR 143-1929 (Scope's Revised Price Quote (May 29, 2018)).  Scope also submitted a revised technical proposal with add-backs to some positions and hours in an effort to remedy the issues identified by the CMS technical panel. AR 142-1926; AR 144-1937 to 2023 (Scope's Revised Technical Proposal (May 29, 2018)).

On May 30, 2018, the contracting officer sent an additional e-mail to Scope, seeking various modifications and inviting Scope to again revise their bid.  AR 145-2026 (Contracting Officer's e-mail to Scope (May 30, 2018)) ("I'm requesting that Scope revise your price quote to include licenses that will be needed should a migration . . . not occur.") (emphasis removed). Scope then submitted a revised bid on May 31, 2018 and raised their overall price for only the option that excluded the AWS migration.  *Compare* AR 142-1929, *with* AR 149-2045; *see also* AR 148-2041 (Scope's transmittal (May 31, 2018)).  This change made the price quote inclusive of the option cheaper than that without the option.  AR 149-2045.

---

[10]At this time, CMS still expected the vendor would provide Amazon Web Services ("AWS") migration, although this optional requirement was later dropped due to the length of this procurement.  The FFP total with the AWS migration was $[***].  AR 126-1857.  The T&M total inclusive of the AWS migration was $[***].  AR 127-1862.

### G. *Scope Wins the DSH Contract and Sparksoft Protests in this Court*

On June 8, 2018, CMS issued its decision memorandum awarding the contract to Scope. AR 153-2075 to 108 (Award Decision Memorandum (June 8, 2018)).  In the award memorandum, CMS justified the decision to award the contract to Scope because "[***]."  AR 153-2108.  Further, the lower overall price of Scope's proposal meant there was no "trade-off decision to be made."  AR 153-2108.  The Contracting Officer informed Sparksoft of the decision on June 11, 2018, also terminating the previously awarded contract.  AR 154-2109 (Termination notice to Sparksoft (June 11, 2018)).

In the award memorandum, CMS performed a realism analysis on the professional compensation from Scope's *May 8, 2017 quote*, as contrasted to their updated (and much lower) 2018 quote.  AR 153-2096, 2099-102 ("Scope provided a professional compensation plan as part of their revised quote dated May 8, 2017.").  Seemingly gaining awareness of this circumstance after the fact, on June 12, 2018, the Contracting Officer sent an e-mail to Scope noting that "[t]he quoted amount on May 8, 2017 and May 31, 2018 for the 'with AWS' option dropped from $[***] to $[***][,] [a] reduction of $[***] or approximately 31%."  AR 155-2113.  The Contracting Officer asked Scope to "explain how Scope was able to reduce the FFP portion of the quote by $[***] or 28%, . . . *while still providing the same labor categories and hours that were included previously at the higher FFP*?"  AR 155-2114 (emphasis added).  Scope responded on June 13, 2018 that they "took several steps to lower our price. *We discounted our labor rates.  We negotiated for and received additional discounts . . .* [; w]e reduced our fee."  AR 155-2113 (emphasis added).

Sparksoft filed a pre-award bid protest with this court on June 13, 2018.  *See Sparksoft Corp. v. United States*, No. 18-847.  In the complaint, Sparksoft alleged CMS improperly reopened the competition for the DSH after their original quoted price had become public knowledge.  Compl. in No. 18-847 ¶ 6.[11]  According to Sparksoft, CMS should have only reopened the bidding with respect to the improperly considered ODCs that had caused GAO to sustain the most recent protest.  Compl. in No. 18-847 ¶ 5-6.  After the filing of the administrative record on June 29, 2018 in No. 18-847, ECF No. 23, Sparksoft amended its complaint to include a post-award bid challenge.  Am. Compl. in No. 18-847, ECF No. 27.  At that point, the government revealed in its motion for judgment on the administrative record, No. 18-847, ECF No. 35, that CMS had *not* finished their evaluation of quotes and could still solicit revised proposals, *id.* at 20-22 ("CMS has not made a *final* decision to award the contract to Scope" (emphasis in original)).  In response, Sparksoft stipulated to a dismissal of their complaint.  Case No. 18-847, ECF No. 39.[12]

---

[11]That disclosure allowed Scope to [***] in the subsequent proceedings on the solicitation.

[12]Sparksoft stipulated to dismissal of Count I (expansion of the GAO's corrective action) with prejudice, but the remaining claims were dismissed without prejudice.

H.  *CMS Reopens the Bidding Yet Again*

Following the voluntary dismissal of Sparksoft's first lawsuit in this court, CMS once more undertook discussions with Scope and Sparksoft in October 2018.  After individual telephone conferences, AR 157-2134 to 37 (Records and notes of calls with Sparksoft and Scope (Oct. 17, 2018)), the Contracting Officer sent both Scope and Sparksoft new requests for revised quotes, due November 1, 2018, AR 158-2138 to 39; AR 159-2140 to 42 (Letters to Scope and Sparksoft requesting revised quotes (Oct. 18, 2018)), and provided a revised statement of work, AR 160-2143 to 2204.  On that same day, CMS also filed an internal memorandum detailing the need for revised quote requirements due to the significant time since the original solicitation. AR 162-2267.

The requests for revised quotes modified the solicitation in a material way.  In the requests, CMS explicitly stated that the agency "*will not be conducting price realism analysis on the entire quote* as this is a firm fixed price contract.  The labor portion of the work will be evaluated to ensure the labor categories and hours proposed are realistic to perform the work." AR 159-2141 (emphasis added).  CMS nonetheless maintained the portion of the RFQ that stated that the compensation for professional employees would be evaluated pursuant to FAR § 52.222-46.  AR 166-2277 (question 3, affirming that the evaluation would occur per the RFQ of Feb. 2, 2017), *see also* AR 11-316 ("The information submitted as required by FAR § 52.222-46 [compensation for professional employees] will be evaluated as outlined in the provision."). FAR § 52.222-46 requires that all "[t]he professional compensation proposed will be considered in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation."  Thus, while the requests for revised quotes stated there would be no price realism analysis, the RFQ stated the exact opposite for professional compensation by incorporation of FAR § 52.222-46.  Sparksoft promptly sought clarification.  *See* AR 164-2272 (E-mail exchange with Sparksoft about RFQ interpretation (Oct. 22, 2018)).  In response, the Contracting Officer noted the dichotomy, stating, "I can update that section to match . . . . Thanks for pointing the discrepancy out."  AR 164-2272.  After additional back and forth regarding other questions about the solicitation, CMS extended the due date for quotes to November 5, 2018.  AR 170-2295 (E-mail extending proposal deadline (Oct. 29, 2018)).  But the discrepancy regarding FAR § 52.222-46 remained, *see, e.g.*, AR 167-2279, which prompted Sparksoft to press their inquiry, *see* AR 171-2297 (Oct. 29, 2018) ("[D]oes the contracting officer intend to modify the RFQ to remove the requirements of FAR § 52.222-46, or does the Contracting Officer intend to conduct a price realism analysis on the total compensation plan . . . ?").  In response, the Contracting Officer stated, "there is a difference in how Sparksoft and CMS are interpreting the language."  AR 171-2299.  The Contracting Officer opined that "Sparksoft is reading the evaluation requirements for the professional compensation plan to pertain to the entire business volume, when in fact they only pertain to the information submitted directly as part of the professional compensation plan."  AR 171-2300.  According to CMS, "[t]he language provided from FAR [§] 52.222-46 speaks only to how the professional compensation plan information will be evaluated" rather than the entire price of the contract.  AR 171-2300.  CMS cited the GAO decision of March 22, 2018 in support of their interpretation.  AR 171-2300.[13]

---

[13]The Contracting Officer quoted a portion of GAO's decision of March 22, 2018, that stated:

Promptly thereafter, on November 2, 2018, Sparksoft commenced this second round of litigation in this court as a pre-award protest. *See* Compl. Both Sparksoft and Scope submitted their quotes to CMS on November 5, 2018, several days after Sparksoft's new suit was filed. AR 173-2304 to 05; AR 174-2306 to 09. The case has proceeded on an expedited schedule.

## JURISDICTION & STANDING

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act vests this court with jurisdiction to "to render judgment on an action by an interested party objecting to a . . . proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

A threshold issue is whether Sparksoft has standing to challenge the CMS' actions involved in its consideration of the pending offers, a burden borne by the plaintiff. *See Myers Investigative & Sec. Servs. Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To demonstrate standing under 28 U.S.C. § 1491(b)(1), a plaintiff must show that it is an "interested party" who suffered prejudice from a significant procurement error. *CliniComp Int'l, Inc. v. United States*, 904 F.3d, 1353, 1358 (Fed. Cir. 2018). An interested party is "an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Id.*; *see also Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)). The interested party suffers prejudice from a significant procurement error when "but for the error, it would have had a substantial chance of securing the contract." *CliniComp*, 904 F.3d at 1358.

Scope advances the argument that Sparksoft lacks standing because it is not an "interested party." *See* Def.-Intervenor's Cross-Mot. at 11-18. In support of this argument, Scope turns to evidence regarding the status of one of Sparksoft's industry certifications. *Id.* at 14-15.[14] Scope contends that although Sparksoft possessed the requisite certification level at the

---

> In the context of fixed-price contracts, our Office has noted that this FAR provision [§ 52.222-46] anticipates an evaluation of whether an awardee understands the contract requirements, and has offered a compensation plan appropriate for those requirements—in effect, a price realism evaluation regarding a vendor's proposed compensation.

AR 171-2300.

[14]The certification is Capability Maturity Model Integration ("CMMI"), a process originally designed to "assess the quality and capability of [] software contractors." *What is CMMI?*, CMMI Institute, https://cmmiinstitute.com/cmmi/intro (last accessed Jan. 7, 2019). It is used to "help any organization in any industry build, improve, and measure their capabilities and improve performance." *Id.* CMMI is rated from a scale of 0 ("incomplete") to 3 ("defined") for capability, which applies to "an organization's performance and process improvement achievements in individual practice areas." *Id.* The individual practice areas are rated on a scale of 0 ("incomplete – [w]ork may or may not get completed") to 5 ("optimizing – [o]rganization is

time of the original bid and for some time thereafter, an aspect of the certification had lapsed by the time CMS asked for revised quotes on October 18, 2018. *Id.*[15]  And due to this lapse in certification, Scope argues that Sparksoft "could not comply with the mandatory eligibility requirement and [could not] receive a contract award," and therefore cannot be an interested party. *Id.* at 16.

Sparksoft in its reply counters that "the [s]olicitation does not state or infer that an offer must be found ineligible for award for not having a current [certification] . . . .  Instead, the [s]olicitation includes the [certification] as a single subfactor in one of several technical factors that the agency will evaluate in reviewing quotes." Pl.'s Reply at 22 (emphasis removed). According to Sparksoft, "where the agency intended a [s]olicitation provision to provide a threshold requirement for elibiglity, the text of the provision clearly states so . . . [, and] no such language is used in reference to the CMMI Level 3 appraisal, or any other technical factor." *Id.* at 23.

The court finds Scope's argument regarding standing to be unpersuasive.  First, the government does not join in Scope's effort to have Sparksoft's bid ruled ineligible.  *See* Def.'s Reply at 1 n.1 ("[T]he agency has not made a determination that Sparksoft is ineligible for award.").  In this respect, the administrative record is ambiguous as to the type of certification that is required.  The RFQ states that "[t]he prime quote shall provide a copy of this current CMMI level 3 – Development (or higher) appraisal." AR 11-312.  When a draft of the RFQ was published, Sparksoft noted that the proposed Statement of Work referred to "[t]he CMMI level III contractor." AR 15-417.  Sparksoft asked: "Will CMS specify CMMI for Development or Services." AR 15-417.  CMS responded that "[t]he RFQ will require offerors to provide a CMMI level 3 (or higher) certificate with their quote." AR 15-417.  Those questions and responses were issued by CMS in conjunction with the ensuing RFQ and Statements of Work, *see* AR 15-407, and have not been rescinded.  The later iterations of the Statement of Work carried this response forward. *See, e.g.*, AR 16-2146 (Statement of Work (Oct. 17, 2018) ("The CMMI Level III contractor shall furnish all necessary personnel, materials, services, . . . and otherwise do all the things necessary for or incident to the performance of work . . . .").

Sparksoft emphasizes that CMS' answer to its specific questions required a CMMI level 3 certificate, not a particular type of certificate at that level. Pl.'s Reply at 24.  Sparksoft also looks to the solicitation, arguing that the certificate constitutes one of a number of technical factors that CMS will evaluate in reviewing quotes, *id*. at 22, and that it will be assigned an

---

focused on continuous improvement and is built to pivot and respond to opportunity to change"). *CMMI Levels of Capability and Performance*, CMMI Institute, https://cmmiinstitute.com/learning/appraisals/levels (last accessed Jan. 7, 2019).

[15]Sparksoft included with its earlier offer a copy of the certificate that Sparksoft had been appraised at CMMI maturity Level 3 for Development. *See* AR 38-1017.  Scope acknowledges as much, but it observes that the certificate shows that the appraisal for Development remained valid until July 17, 2018.  Def.-Intervenor's Reply at 3 ("[O]fferors must have a current CMMI level 3 Development appraisal that has not lapsed.").  At this juncture, the parties agree that Sparksoft has a CMMI level 3 appraisal for Services.  *See* Pl.'s Reply at 24; Def.-Intervenor's Reply at 6.

adjectival rating, not adjudged on a pass/fail basis, *id.* at 23. Relatedly, Sparksoft cites small business status, as to which the RFQ states, by contrast: "Any quote that is submitted by a contractor that is not a certified small business will not be considered for award." AR 11-308. Sparksoft avers that "[n]o such language is used in reference to the CMMI Level 3 appraisal, or any other technical factor." *Id.* at 23.

In these circumstances, the court finds that CMS had responsibility to evaluate Sparksoft's offer insofar as technical factors were concerned, including the CMMI level III appraisal, on an adjectival basis, and that holding a CMMI Level III Development appraisal was not a mandatory prerequisite for an award. Scope's challenge to Sparksoft's standing accordingly is unavailing, and Sparksoft has standing to pursue this protest.

## STANDARD OF REVIEW

### A.     *Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's review of a protest to the government's decisions regarding award of a contract. See 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, a court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief. See *PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion*, 115 Fed. Cl. at 550.

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Id.* (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)). The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 554 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues . . . in the procurement process, *AgustaWestland N. Am., Inc., v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 554 F.3d at 1332-33). Accordingly, the protester bears the burden of showing that the award decision had no rational basis. *Centech Grp.*, 554 F.3d at 1037. Relief in protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 554 F.3d at 1333).

## ANALYSIS

Resolution of this case largely turns on an application of the word "realism" in FAR § 52.222-46(a).  The Subsection specifies that "[*t*]*he professional compensation proposed will be considered in terms of* its impact upon recruiting and retention, *its realism*, and its consistency with a total plan for compensation."  FAR § 52.222-46(a).  The provision is required to be incorporated in RFPs for negotiated contracts expected to exceed $700,000 when the services to be provided "will require meaningful numbers of professional employees."  FAR § 22.1103.  This solicitation easily qualifies.  The most recent bids exceeded $[***] million, and all or virtually all of the employees who would provide the services are IT engineers and professionals.

### A.  Professional Services Contracts Subject to FAR § 52.222-46

The principal disagreement in this case is whether reference to FAR § 52.222-46 in the RFQ requires CMS to conduct a realism analysis on the professional compensation pertinent to the FFP portion of the submitted quotes.  Sparksoft argues that CMS' announced refusal to conduct a realism analysis is "inconsistent with the requirements of the [s]olicitation and creates a patent ambiguity in the RFQ."  Pl.'s Mot. at 17.  According to Sparksoft, this "patent ambiguity" creates a "Catch-22 situation"[16] because it fears proposing high rates that would exceed those of competitors or lower rates that CMS would find unrealistic if it conducted a realism analysis, losing the bid either way.  *Id.* at 30-31.  Thus, Sparksoft argues this question about the realism analysis must be resolved so that "Sparksoft is not denied a fair opportunity to compete for award of the task order under full and open competition."  *Id.* at 17.

The government, on the other hand, argues that Sparksoft's interpretation of FAR § 52.222-46 is "unreasonable" because "[t]he FAR does not mandate a price realism analysis before the award of a fixed-price contract."  Def.'s Cross-Mot. at 8-9 (emphasis removed).  The government contends that FAR § 52.222-46 does not apply to the professional labor rates charged to CMS, but rather only applies to the professional rates paid by either Scope or Sparksoft to its employees.  *Id.* at 8.  According to the government, "[t]hat regulation relates to the compensation provided to professional employees – not the prices charged to the agency for those employees' work."  *Id.*  And "[o]fferors are free to lose money on a fixed-price contract."  *Id.* at 9 (emphasis removed).  Thus, the government attempts to erect a wall between the compensation paid to employees by the bidder and the rates used as the basis of the charges to CMS by the bidder, with FAR § 52.222-46 only applying to the actual compensation paid to employees.  The government also challenges the feasibility of conducting a realism analysis because "[o]fferors are not required to provide a 'breakout of labor categories, hours, and hourly rates' for the fixed-price portion of the quote."  *Id.* (citing AR 11-311) (emphasis removed).  That is true insofar as the specific FFP portion of the contract is concerned, but misleading because offerors were required to submit professional compensation plans covering all of the work.

In the alternative, the government argues that even if Sparksoft's interpretation of FAR § 52.222-46 is reasonable, CMS resolved any ambiguity in the situation by stating to both bidders that it "will not be conducting price realism analysis on the entire quote as this is a firm fixed

---

[16]The reference is to the eponymous novel *Catch-22*, by Joseph Heller.  The term refers to a logical paradox that a pilot encounters in World War II bomber service.

price contract." Def.'s Cross-Mot. at 10 (citing AR 158-2139; AR 159-2141). In the eyes of the government, CMS made it "crystal clear" that the FAR § 52.222-46 analysis would only be conducted "on information pertaining directly to the professional compensation plans, and CMS would not evaluate offers for price realism." *Id.* at 10-11 (emphasis removed). At bottom, the government argues there is no patent ambiguity due to the communications from CMS to Sparksoft and Scope.

Scope, as the defendant-intervenor, contends that "[t]o succeed on the merits of its claim, Sparksoft must demonstrate that FAR [§] 52.222-46 required a price realism evaluation that mapped the compensation plan directly to the price quote." Def.'s-Intervenor's Cross-Mot. at 19. In its view, "the February 2, 2017 [s]olicitation never required the realism evaluation that Sparksoft now asserts was required," but instead showed the "agency intended to conduct a realism analysis of the compensation plans – the only realism analysis required." *Id.* at 20. Similar to the government, Scope argues "offerors could, for strategic reasons, 'buy-in' to the contract, understanding that its FFP may result in receiving less payment for work performed than its costs to pay personnel to perform." *Id.* at 24. Thus, Scope also attempts to erect a barrier for the implementation of FAR § 52.222-46 between the compensation paid to employees by Scope (or Sparksoft) and the price charged by Scope (or Sparksoft) to CMS.

Scope also advances the argument that CMS is "prohibited from conducting a price realism evaluation on a FFP contract, absent a statement in a solicitation advising offerrors that the agency will conduct such an analysis." Def.-Intervenor's Cross-Mot. at 21. And "[h]ere, the inclusion of FAR [§] 52.222-46 created a limited requirement to conduct a realism analysis of a particular portion of the offerors' proposals . . . . The FAR Clause never mandated an extension of a realism analysis to the FFP (or even the T&M) prices." *Id.* at 24-25. According to Scope, this meant there was no "ambiguity or inconsistency" between the RFQ and its clarification statements.

1. *The purposes underpinning FAR § 52.222-46(a).*

FAR § 52.222-46 states that "[r]ecompetition of service contracts may in some cases result in lowering the compensation" of professional employees, which "can be detrimental in obtaining . . . adequate contract performance." FAR § 52.222-46(a). The provision requires "offerors [to] submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees." *Id.* These submitted plans will be evaluated by the agency to "[en]sure that it reflects a sound management approach and understanding of the contract requirements" as a basis for assessing whether the offeror can "provide uninterrupted high-quality work." *Id.* A key purpose of FAR § 52.222-46 is "to evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance, and to evaluate whether offerors understand the nature of the work to be performed." *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 369-70 (2010) (quoting *Innovative Mgmt., Inc.*, 2003 C.P.D. ¶ 209, 2003 WL 22663253 (2003)) (additional citations omitted). Procuring agencies are given directions for their analysis:

> The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, *its realism*, and its consistency with a total plan for compensation. Supporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public

and private organizations, used in establishing the total compensation structure. FAR § 52.222-46(a).

FAR § 52.222-46(a) (emphasis added).

The provisions of FAR § 52.222-46 applicable to those who perform professional services are designed to "mirror[] those afforded to other workers under the McNamara-O'Hara Service Contract Act (SCA),[ 41 U.S.C. § 6702(a)]," *CRAssociates*, 95 Fed. Cl. at 370 (citing 41 U.S.C. § 6704),[17] which applies to any service contract made by the federal government or the District of Columbia exceeding $2,500, 41 U.S.C. § 6702. The Service Contract Act, in turn, is designed to "protect 'wage standards of employees' by preventing 'federal purchasing power [from] playing a role in suppressing wage rates,' with particular emphasis given to the impact of that power in rebiddings and successor contracts." *CRAssociates*, 95 Fed. Cl. at 370 (quoting *Fort Hood Barbers Ass'n v. Herman*, 137 F.3d 302, 309 (5th Cir. 1998)) (alteration in original, additional citation omitted).

The Federal Circuit interpreted the predecessor of FAR § 52.222-46 as accepting an agency's action to "compare the incumbent's compensation to that proposed by the offerors as a prelude to determining whether further analysis of the offerors' compensation plan is required." *CRAssociates*, 95 Fed. Cl. at 371 (citing *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000)); *see also CSC Gov't Solutions LLC v. United States*, 129 Fed. Cl. 416, 432-33 (2016) (approving the procuring agency's focus on specific details of an offeror's proposed salaries and fringe benefits for professional employees and the agency's resulting conclusion that the offeror's plan was realistic because the fringe benefits encouraged continuity of the workforce despite salaries that were lower than the incumbent's); *CTA, Inc. v. United States*, 44 Fed. Cl. 684, 693-94 (1999) (holding that, if necessary, contract officers could obtain an incumbent's compensation figures to make comparisons to a bidder's proposed compensation figures). This comparison does not require "impeccable rigor." *CRAssociates*, 95 Fed. Cl. at 371.

   *2. CMS' stated (revised) approach to evaluating realism of professional compensation.*

The contract at issue in this bid protest is priced almost entirely on a fixed-price basis (FFP), meaning the government will pay a flat fee for the IT services provided, regardless of the hours worked. But this large fixed portion is virtually all for professional IT services performed by educated and trained individuals. *See, e.g.*, AR 1-3 to 4; AR 11-310 to 11.

In their bids, the offerors were required by the RFQ to provide "total compensation rates" for professional employees due to the inclusion of FAR § 52.222-46. AR 11-311 to 312. Pursuant to FAR § 52.222-46, in volume I (business/price) both Sparksoft and Scope provided CMS with the types of employees they planned to hire, a range of possible salaries (low, mid, and high points), and the fringe benefits they would offer these employees. *See* AR 19-484 to 486; AR 36-754 to 756. And, as required in volume II (technical), both bidders submitted to CMS the number of hours they expected the categories of identified employees to work for each of the contract years. AR 21-554 to 55; AR 38-848 to 49. In short, CMS possessed all of the information required to generate a realism analysis on the professional compensation proposed

---

[17]This statute was formerly codified as 41 U.S.C. § 351.

by both bidders – the proposed hours for each employee type, the proposed professional compensation ranges for each employee type, and the fringe benefit amount.

Wholly apart from FAR § 52.222-46, CMS had reason to conduct a realism analysis due to Scope's marked lowering of price (approximately 31%) in April and May 2018 and then November 2018 from their 2017 bid. While this drop would merit further investigation on its own, the fact the contract was composed virtually entirely of professional services should have raised additional concerns for CMS. Essentially, because the great bulk of the contract was priced as a FFP and the FFP was almost entirely professional compensation, Scope appeared reduce its price by cutting into professional compensation rates, expected hours, and its own profit.

Due to these changes, CMS raised these concerns in e-mails to Scope in April 2018 and then subsequently in June 2018. *See supra*, at 9-10. Scope's response to the e-mails were indefinite as to realism, instead stating initially that they had the same level of effort and labor mix, AR 130-1880, causing CMS to renew its technical evaluation. *See supra*, at 9. When that evaluation showed significant decreases in, and elimination of, positions, AR 134-1891 to 1900, a further inquiry to Scope caused them to state that they "discounted their labor rates" and "reduced their fee," AR 155-2113. Thus, the combination of the nebulous responses by Scope to the Contracting Officer's e-mails and the significant cuts to their proposed hours should have triggered CMS to conduct a realism analysis on Scope's updated quote, even taking into account Scope's add-backs in May 2018 to address the CMS technical panel's concerns. CMS' later answer in October 2018 to questions by Sparksoft about conflicts between the answers and FAR § 52.222-46 appeared to sidestep the situation that had emerged regarding Scope's quotes. *See supra*, at 11-12. Scaling back compensation along with positions and hours directly affects realism, and CMS should not have divorced the technical analysis from an evaluation of the realism of the professional compensation.

Despite these red flags, the government contends that CMS disavowed any obligation to conduct a price realism analysis in their revised request for quotes, notwithstanding the inclusion of FAR § 52.222-46. *See* AR 159-2141 (stating "the agency will not be conducting price realism analysis on the entire quote as this is a firm fixed price contract."). This characterization avoids the issue. Price realism as such is not involved,[18] but the realism of professional compensation definitely is. Not only did CMS leave FAR § 52.222-46 in the revised solicitation, the FAR also *prohibits* the agency from removing the provision. FAR § 22.1103 requires FAR § 52.222-46 to be inserted into "solicitations for negotiated contracts when the contract amount is expected to exceed $700,000 and services are to be provided which will require meaningful numbers of professional employees." As the contract here is for more than $[***] million and almost entirely calls for services by professional employees, the inclusion of, and compliance with, FAR § 52.222-46 is mandatory.

CMS is likely aware that FAR § 52.222-46 is mandatory. The Contracting Officer thanked Sparksoft for noting the discrepancy between the inclusion of FAR § 52.222-46 in the revised RFQ and CMS' statements disavowing a price realism analysis, and promised to rectify

---

[18]As noted earlier, in the RFQ, CMS stated that it would not invoke price realism but it would apply FAR § 8.405-2, AR 11-316, which calls for a "determin[ation] that the total price is reasonable," FAR § 8.405-2(d).

the situation.  AR 164-2272 ("I can update the section [of the RFQ] to match.") (E-mail (Oct. 22, 2018)).  The RFQ then was not changed, but CMS attempted to rely on a "difference in how Sparksoft and CMS are interpreting the language," AR 171-2299, to escape the professional compensation realism analysis.  CMS cannot disavow a mandatory provision in the RFQ through contrary statements or claims of differences in interpretation.

The government and Scope, in their briefs and at the hearing, also argued that even if CMS had the obligation to conduct a realism analysis on professional compensation, CMS was unable to conduct the analysis because it lacked the requisite data.  *See* Def.'s Cross-Mot. at 10.  According to the government, "it is unclear how CMS could analyze the realism of the offerors' firm-fixed price when the offers are not required to submit information about how those prices were calculated."  *Id.*  Scope similarly contends that "[b]ecause the [s]olicitation required ranges [in professional compensation] . . . there was no mechanism for the agency to determine whether offerors' compensation plans matched the prices proposed."  Def.-Intervenor's Cross-Mot. at 29.

Contrary to those protestations, both Scope and Sparksoft produced appendices to their briefs that showed how a price realism analysis could be completed with relative ease.  *See* Pl.'s Mot. Ex. A; Def.-Intervenor's Cross-Mot. Ex. A-1.  Manifestly, CMS possesses all of the necessary information to conduct a realism analysis of planned professional compensation.[19]  And performing a realism analysis on a range of compensation does not render the result without value.  CMS could perform the analysis for the low, midpoint, and high professional compensation rates within the submitted ranges.[20]  This analysis would provide CMS with a range of information regarding the realism of the proposed compensation schedules.  Scope's price realism analysis shows that at the low end of their professional compensation range, they might make a small profit.  *See* Def.-Intervenor's Cross-Mot. Ex. A-1.  Sparksoft's analysis shows Scope losing $[***] million at their midpoint compensation levels.  *See* Pl.'s Mot. Ex. A.  At the very least, this analysis indicates to the government that Scope, or any bidder with similar numbers, may be setting their professional compensation ranges too low, presenting a risk to the government – the exact issue FAR § 52.222-46 seeks to address, leaving aside the reductions in positions and hours.

Finally, that the contract at issue is almost exclusively structured as a FFP does not eliminate the need for realism analysis under FAR § 52.222-46.  Labeling a contract as "FFP," when the contract requires almost entirely professional services, does not magically excuse the government from performing a realism evaluation of the proposed professional compensation rates.  Therefore, CMS' ostensible decision, stated in answers to questions, to not conduct a realism analysis is contrary to FAR § 52.222-46.  The court concludes that CMS has an obligation to undertake a realism analysis of the professional compensation rates proposed by the two bidders to ensure they will satisfy the requirements of FAR § 52.222-46 and provide the government "uninterrupted high-quality work."

---

[19]Even if CMS had believed that the offerors had not provided the necessary information, the agency could have requested that they do so.

[20]Sparksoft performed this analysis for Scope's midpoint salaries and Scope performed this analysis for their low-point range.  *See* Pl.'s Mot. Ex. A; Def.-Intervenor's Cross-Mot. Ex. A-1.

## B. Prejudice

The court finds that Sparksoft will suffer prejudice if CMS does not perform the analysis required by FAR § 52.222-46. Scope significantly cut their bid from the first round of offers by reducing their overall quote price by 32%. Sparksoft is correct in pointing out its disadvantage in the dark waters of ambiguity. If CMS will not conduct a realism analysis on the proffered plans for professional compensation, Sparksoft risks being undercut by Scope with a potentially less "realistic" bid. CMS has improperly set the stage for the very wage-rate price war that FAR § 52.222-46 is designed to prevent.

## C. Equitable Relief

The Tucker Act grants this court power to "'award any relief'" in a bid protest action "'that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.'" *Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 223 (2010) (quoting 28 U.S.C. § 1491(b)(2)); *see also, e.g.*, *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 194-95 (2015) ("The court 'is free to consider the appropriateness of declaratory relief,' taking into account whether a declaration will resolve the dispute.") (quoting *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1271 (Fed. Cir. 1999)); *Miles Constr., LLC v. United States*, 108 Fed. Cl. 792, 806 (2013) ("The court may award declaratory or injunctive relief that is proper in the circumstances."). This determination is left to the court's "equitable discretion." *Angelica Textile*, 95 Fed. Cl. at 223 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) ("[T]here is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4).")).

"To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1036-37 (Fed. Cir. 2009) (citing *PGBA*, 389 F.3d at 1228-29). In this respect, declaratory relief that is in fact coercive in nature is subject to the same standards as injunctive relief. *See Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 194 (2007) (citing *PGBA*, 389 F.3d at 1228)); *see also Samuels v. Mackell*, 401 U.S. 66, 73 (1971) ("Ordinarily . . . the practical effect of [a declaratory judgment and an injunction] will be virtually identical.").

1. *Success on the merits.*

As established *supra*, Sparksoft has succeeded on the merits of its protest.

2. *Irreparable harm.*

Sparksoft claims it would suffer irreparable injury if denied equitable relief, "because it will have lost the opportunity to be evaluated on a level playing field and to earn profits on a contract it would have been awarded in a fairly conducted process." Pl.'s Mot. at 32. The government argues that Sparksoft has suffered no harm because it has "not been treated unfairly, and may yet win the award," and "CMS'[] interpretation [was] made clear at least a week before

Sparksoft submitted its quote." Def.'s Cross-Mot. at 12. Scope similarly argues "[a]ny such harm was of Sparksoft's own making" and the "balance of hardships is not in its favor." Def.-Intervenor's Reply at 16-17.

"Competitive detriment to plaintiffs stemming from denial of a fair opportunity to participate in a lawful procurement process 'also engenders irreparable harm.'" *Springfield Parcel*, 124 Fed. Cl. at 194 (citations omitted). CMS' decision to not conduct a realism analysis of professional compensation on the FFP portion of the offers will result in a denial of opportunity for Sparksoft to fairly compete for the DSH contract. Sparksoft will be irreparably harmed absent equitable relief.

   3. *Balance of hardships.*

The balance of hardships also favors Sparksoft. The government argues that "[b]ecause Sparksoft has not been harmed, the balance of hardships does not weigh in its favor." Def.'s Cross-Mot. at 12. But the procurement in this case has already dragged on well-past its due date. Ensuring a proper evaluation of pending offers is a marginal burden, to put it mildly. Further, as demonstrated by both Sparksoft and Scope, CMS has all the necessary information to complete a realism analysis on the proffered professional compensation plans, and the analysis does not appear to be especially onerous.

   4. *Public interest.*

"The public has a strong interest in preserving the integrity of the procurement process. *Miles Construction*, 108 Fed. Cl. at 806-07 (citing *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242-43 (2010); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004)). The public interest here will be served by ensuring that the plaintiff has a fair opportunity to compete for the DSH contract. The public interest also is served when agencies comply with FAR § 52.222-46 to ensure "uninterrupted high-quality work." This outweighs the government's contention that "there is a public interest in 'minimizing disruption to the agency.'" Def.'s Cross-Mot. at 12 (citing *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 321 (2009)).

In sum, the court finds all four factors favor granting Sparksoft's motion for equitable relief.

## CONCLUSION

For the foregoing reasons, Sparksoft's motion for judgment on the administrative record is GRANTED. The government's cross-motion for judgment on the administrative record is DENIED. Scope's motion to dismiss and cross-motion for judgment on the administrative record are also DENIED.

The court issues a declaratory judgment that CMS shall evaluate the pending offers by Scope and Sparksoft in the procurement process for the DSH contract by conducting a realism analysis on the offerors' proffered plans for professional compensation, as mandated by FAR § 52.222-46, related to the entire contract, including the FFP portion.

The Clerk is directed to enter judgment in accord with this disposition.  Costs are awarded to Sparksoft.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge